and I think counsel heard me discuss the ground rules before we started the clock, was everything clear? Do you need any further explanation from me, Mr. Rubin or Ms. Rizzoni? No your honor. No your honor. Thank you. And I know both of you are veterans from our first audio oral argument on Thursday, so you've had a practice run at this already, so unless there are no further questions, let's begin with the first argument from Mr. Rubin. You may proceed. This is Daniel Rubin on behalf of Ms. Cortez and Ms. Reyes Moreno. May it please the court opposing counsel, the 20 plus minute traffic stop for speeding was undoubtedly prolonged. The video makes this clear. The officer's testimony at the suppression hearing makes this clear. In Rodriguez v. the United States, the Supreme Court held that inquiries needed to handle a traffic stop involved checking the driver's license, determining whether there are outstanding warrants and inspecting the automobile's registration and proof of insurance. A traffic stop prolonged beyond the amount of time reasonably required to complete the stop's mission is unlawful. Here, there were more than a dozen inquiries that were unrelated to the speeding stop, including where the defendant had been living, who she was with, her relationship with her sister, whether they were biological sisters, whether they were staying together, how long they'd been in Douglas, Arizona, the occupation of her non-present boyfriend, and how many lakes were in Alabama. How is any of this remotely related to speeding? It's not, and the officer admitted so accordingly. The officer collected Ms. Cortez's license, insurance, and registration within minutes of the stop, yet it took him 20 minutes to complete the speeding citation, even though the citation self-populated and there was no testimony that there were any computer or equipment glitches. At the suppression hearing, the officer was questioned, and the question was, and so since approximately three minutes and 50 seconds on the timestamp of the video, you were having a conversation with Ms. Cortez about things that have nothing to do with the speeding violation. He answered yes. Not only was the driver questioned about issues completely unrelated to the speeding violation, but the non-driver was also questioned with questions unrelated to the traffic stop. The officer was engaged in a fishing expedition that clearly prolonged the stop, and this was unlawful. And this idea that he was riding the ticket simultaneously just isn't the case and was not at all credible. Unfortunately, the district court applied the wrong standard when it viewed the evidence in the light most favorable to the United States. Based on this incorrect standard, no matter what the officer said, the court would have believed him. In Abbott versus Perez in 2018, the Supreme Court stated, when a finding of fact is based on the application of an incorrect burden of proof, the finding cannot stand. We ask this court to reverse the lower court's denial of the defendant's motion to suppress and suppress the fruits of the unlawful stop, detention, and interrogation. There is no argument from the government that there was any reasonable suspicion for the first seven minutes of the stop. However, even after this point, the extension of the stop was not justified by reasonable suspicion when the officer saw the two men in the back seat for three reasons. First, because there was no reasonable suspicion even when he saw the men. However, assuming this court found that there was reasonable suspicion at this point, the second reason the extension of the stop was not justified is because it was fruit of the original illegal prolonged stop. And third, the officer was not allowed to continue to prolong the stop even if he had reasonable suspicion. During the officer's questioning of the two defendants, there was enough in the court Counsel? Yes, this is Judge Sienkiewicz. Let's, um, that's a, we'll pass a three-minute mark and I thought it might be a chance for us to, um, to dig into, um, your opening statement a bit. And, um, is it your contention that all of the innocuous or social questions were asked were improper or that, um, only, only some of them were improper, others might be permissible under our cases that will permit inquiry into travel plans and things like that? Yes, Your Honor. According to travel plans, asking where they were going, um, that those are likely permissible, but in terms of whether her sister was a biological sister, what her boyfriend did back in Douglas, Arizona, as well as how many lakes there were in, um, in Alabama, those were clearly impermissible. During the... Yes, Your Honor. We still, we still have, um, those occur all in the first, first seven minutes, right? No, the lakes question occurs, um, certain questions occur after the seven-minute mark, uh, but there's definitely impermissible questions that prolong the stop during the first seven minutes, yes, in terms of what her boyfriend does for a living. And again, this was a non, uh, this was, this was a, a boyfriend who wasn't at the scene, so that, there were impermissible questions before the, the seven-minute mark and then after the seven-minute mark. Um, and according to... And around the... Yes, counsel. Yeah, around the seven-minute mark, um, the officer questioned Ms. Reyes Moreno and then has this, uh, exchange with the two men in the back seat that were unrelated, uh, at that, if, if we don't buy the argument that, that the question of them is, uh, fruit of the, of the, uh, poisonous tree, um, why, why doesn't Alvarez then have some reasonable suspicion that, uh, they may be, um, in the country illegally or that, um, the driver is part of a, of a smuggling operation? Right. He still doesn't have reasonable suspicion, even when it comes to his attention that there's two gentlemen in the back of the car, because all he learns from them is that they don't have any sort of identification, um, as well as that, you know, they answer his questions very, very quickly. That in and of itself does not, uh, provide reasonable suspicion. Um... But listen, Judge Seymour, why don't we add to that the fact that this is a road from Mexico with no checkpoint and isn't it very strange for two single women with children to pick up two strange men? There was, there was, there was nothing implausible about their story. Their story matched. They said they picked them up at a gas station. Um, they were traveling on their way back to Alabama. So in the officer, well, no. So, um, it, it perhaps isn't such behavior that I would engage in or, or yourselves would engage in, but these two women chose to do it. Um, and that was their story. Um, so there was nothing illegal about what they had done and there was not nothing completely implausible. Counsel, this is Judge Moritz. I have a follow-up on that. I think you were getting to it, but I'm not sure in your opening statement, you suggested that even if there was independent, reasonable suspicion that would arguably prolong the stop, I think you were about to suggest that perhaps they couldn't, they didn't have authority to, to extend the stop because they didn't have authority to arrest for immigration violations. So I didn't, at least that's the way I understood your brief, but could you expand on that? That's correct. Um, as a New Mexico state police officer under Arizona versus United States, the Supreme Court held that a state officer lacked the authority and training to perform functions of an immigration officer. Alvarez, uh, officer Alvarez testified. He did not perform an, an immigration inspection, uh, or sorry, he, that he's not allowed to perform an immigration inspection. He's not trained to perform an immigration, uh, inspection in his, in the operation stone garden, uh, directed him to call a border patrol. He testified that he's not authorized to make arrests. He testified that he has no training. Um, and he testified he has no authority to detain anyone for an immigration violation in the, in his transcript. He goes on to say that, um, he called border patrol. That's all he's allowed to do. But then he goes on and he says, if they catch him, they catch him, uh, further down the But he then goes on to say, in fact, he was actually detaining them. Uh, he says that when he's cross-examined. So that's correct. As a New Mexico state police officer, even under operation stone garden, he doesn't have the lawful authority, uh, to detain them for what he suspected to be an immigration violation. Um, under the 10 circuits case, United States goes to Dela Cruz. Um, again, the New Mexico state police officer had no training in recognizing the immigration status of undocumented persons. He's hunched that the passengers were undocumented, does not provide reasonable suspicion that Ms. Cortez and Ms. Reyes-Morana were involved in criminal activity. Presence without documentation is a status crime, which does not necessarily suggest that Ms. Cortez and Ms. Reyes-Morana were involved in criminal activity. A police officer may not legally detain a person simply because criminal activity is afoot. The particular person who is detained must be suspected of criminal activity. Yet the officer continued to prolong the stop. Counsel, um, I'm not, I'm not sure I fully buy that, um, argument, you know, unless you're correct on your earlier, earlier point. But if, uh, an officer stopped somebody and she has, um, people in the vehicle that, um, unreasonably suspects, um, have been involved in a, uh, in a crime, um, isn't it, could an officer, um, continue to extend the detention until he figures out what he's going to do with the, uh, uh, suspects in the backseat? In other words, let's say there was a report of a bank robbery recently and the people in the backseat, uh, you know, fit the description. Couldn't he continue to, um, detain the driver while he figures out how he's going to handle the situation with the passengers? If he has, I mean, I guess in terms of bank robbery, if he has the lawful authority to hold someone for a bank robbery, then yes. But as a New Mexico state police officer, if it's an immigration violation, again, he's not trained. He even admits himself. He's not able to lawfully prolong the stop for an immigration violation. And he, and he, and he, he, he confirmed that in his answer that on a routine basis, if he suspects something that he calls border patrol, but then he's not allowed to prolong the stop. So the, what, what, what, what if he suspects, what, what if he suspects the driver of, um, of what was charged here, conspiracy to engage in alien smuggling? That's not, I know your honor. No, your honor. I think again, given that it's an immigration violation and that that's not his remit remit as a state police officer, no, he's not allowed to detain them or apologies to prolong the stop just to wait for border patrol to arrive. And even the officer knew that and admitted it. He knows he's not allowed to do that. So am I answering your question, your honor? Um, well, I think so. So, so your position is that, um, the officer could not arrest the drivers, even if they had probable cause of alien smuggling. That's only the, your position is only the border control can do that. Um, well, your honor, I don't think there's any argument that there's probable cause. I think just reasonable suspicion, but if there, but yes, it's, it's border patrol is who's trained to understand immigration crimes and it's there. It's, they are authorized to make those arrests. This state police officer is not allowed to do so. And again, we get back to Arizona versus United States. No, he's not allowed to do that under reasonable suspicion. Um, yes, more. Could I, if you were, are you finished with your response to judge? Yes, your honor. I have another question going back to your original argument. You mentioned that you've got the video in the testimony and make it clear that it was a prolonged stop. But the problem that we have is with the district court findings on that. The district court seemed to make a number of findings, uh, that would indicate that while, while the officer officer Alvarez was asking the question, he was also continuing to, to fill out his ticket or complete the ticket or respond to her question about what, you know, how much this was going to cost and various other things that occurred. I read the district court's opinion to say some of these questions might be unrelated, but that they were okay. As long as, as long as the officer continued to complete the citation, how do you respond to that? Well, first of all, the district court using the wrong standard is was plain air in terms of his factual analysis because the district court, the standard used was in the light, most favorable. I think all of the factual findings that judge Gonzalez made, um, are, uh, again, we're in the light, most favorable to the government using the wrong standard. So I don't think this court can give them, uh, really any proper weight. Um, and also I think that I think different minds would see that video and the answers differently that a gentleman who has a license and registration and everything else he needs the officer within four minutes, and then takes 20 minutes to write a speeding ticket. And then simultaneously completing that speeding ticket at the moment that the border patrol, who he's waiting for has arrived is, is clearly, uh, not credible. Um, it's just not credible that it just so happens. He completes everything at the same exact time. Um, unless this officer was the best multitasker in the world, which I don't get that impression from either the video or his, um, testimony. And the fact that it took 16 extra minutes to complete a ticket that was already pretty much populated by the license. Um, it's just not credible. And again, given that judge Gonzalez counsel, that, um, it's a reasonable enough standard. We don't inquire, inquire into the subjective motivations of the officer. And he did say his typical traffic stop takes 10 to 20 minutes. Um, we, why isn't this within the ballpark of what he would have an average police officer might expect to take or a traffic stop? Because it's clear that the seven minutes before he recognized that the men are in the back, he is asking questions to try to, to try to, it's a fishing expedition. That is clear. And then after the seven minute Mark, when he finds the two men, when he calls border patrol and he starts asking about lakes in, in Alabama, it could not be clear that he is intentionally prolonging the stop. If there's no other questions, I'd reserve the rest of my time. I know you don't have much, but I'll give you some rebuttal time. This is the only argument this afternoon. Okay. Thank you, Mr. Rubin. You're welcome. Mr. Uh, let's turn to the United States. Yes, your honor. Good afternoon. Counsel may please the court. If I may start by, um, thanking the court and counsel and the defendants, frankly, uh, for continuing this matter from the March setting to this special setting this afternoon. I just wanted to make sure that everyone knew I was very grateful for that. May it please the court as this court knows it can affirm a district court's ruling on any grounds supported in the record. That being said, this court has a number of grounds upon which it can choose to affirm and should do. First, this court can simply affirm the district court's reasoning and decision finding that the traffic stop in question was not unreasonably extended or prolonged in any way. And that there was no violation of the fourth amendment. We know that the stop lasted approximately 20 minutes. And during that time, Sergeant Alvarez conducted this off in a normal and unremarkable way, including asking permissible questions about travel and other things. This court has exhibit A to the supplemental record on appeal to observe the entire stop from beginning to end and can make those determinations for itself. Second, if the court feels that in some way that the stop was somehow prolonged, this court can certainly find that Sergeant Alvarez had actually developed regional suspicion of a crime approximately approximately seven minutes into the stop when he spoke to the to the passenger front passenger, Ms. Reyes Moreno, and observed the two men in the back of the truck. Looking at the totality of the circumstances, Sergeant Alvarez had the following constellation of factors before him. He had stopped a vehicle on a highway, which is approximately 50 miles from the U.S. Mexico border. In particular, he explained during his testimony at the motion to suppress that this is the route directly from the border that does not have border patrol checkpoints. Having pulled the truck over, he observed two men in the back of the truck with a child who was not theirs in between them. When he asked Reyes Moreno about the men, she was defensive and claimed that she didn't know them and that they were not her friends. Finally, when Sergeant Alvarez asked the men for identification, they wouldn't look at him, requiring him to ask again and to which they simply replied no. Taken together, the facts warranted further investigation, and there was reasonable suspicion to believe that Reyes Moreno and Cortez were involved in criminal activity. On this point, defense makes the argument that Sergeant Alvarez did not have the authority to investigate immigration crimes, and the government does not dispute that. However, he was acting in consultation with the federal government through Operation Stonegarden, which is a federal grant program to help Border Patrol and other agencies. And Judge Timkovich, I think you kind of made the point in your questions to Defense Counsel, but this would be like if a person went into a bank and presented counterfeit money to a teller, they call, say, Albuquerque Police Department, and the Albuquerque Police Department comes to the scene and detains the individual pending the secret service because they have jurisdiction over counterfeiting issues, or counterfeiting crimes, I should say, the Albuquerque Police Department can and should detain pending the response from the secret service. How would you distinguish De La Cruz then? So De La Cruz was a case that was very, actually very, very different from here. De La Cruz was simply a person dropping off an individual to go to work. There was no question or suspicion that the person who had dropped the individual off was engaging in any kind of criminal activity. Here, we had something very different. We had, based on the totality of the circumstances, Sergeant Alvarez had developed reasonable suspicion to believe that defendants were actually transporting illegal aliens. It was the location of the stop, the circumstances related to how the men got into the vehicle, how Reyes Moreno was defensive, and frankly, the unwillingness of the men to even talk to Sergeant Alvarez and their inability to produce identification that combined to create the requisite reasonable suspicion to detain both Cortez and Reyes Moreno for further investigation in this case. When did the officer contact Border Patrol? It was just after he had encountered Reyes Moreno in the front seat. He went back to his vehicle and made the call to Border Patrol. Thank you. Judge Seymour? Yes, counsel, how do you get around the fact that the district court clearly applied the wrong standard, which means we can't rely on his findings, can we? So, Your Honor, first of all, if I may, that issue was first raised, just to be clear, in the reply brief and nowhere in the actual initial briefing or in the response is that issue raised. Nevertheless, there doesn't appear to be any dispute about the facts in this case. The court has in the record the 20-minute video that it can watch to ensure that the facts are correct. And beyond that, this court reviews the district court's final decision de novo. So it's going to have the opportunity to look at everything altogether and make an appropriate determination, despite the fact that the district court did, in fact, use the wrong standard. And just to that end, Judge Seymour, this has occurred in a few cases now, in fact, a case that I argued on Thursday and I know another case perhaps that you were involved in in March. And the district court has been made well aware and has corrected the issue in his opinions going forward. So aren't you basically asking us to act like the district court? No, Your Honor, I'm not, because the defense really doesn't take any issue with the actual facts and what happened here. You have a video that you can look at and see that there's no dispute between the parties about the facts of this case and what occurred during the 20-minute stop. So the court can take those facts and move forward and decide whether the district court's decision was reasonable under the circumstances. What about the defendant's argument that the officer actually admitted in his testimony that he was prolonging the stop, waiting for the immigration to show up? Well, I'm not sure that he... I don't know that he said he was necessarily... Well, I don't know that he said prolonging the stop. I think what he was referring to was he was holding them. Basically, he was detaining them. And if the court wants to take that fact, then what we would argue, Your Honor, is that he had the reasonable suspicion to hold them there pending the arrival of the Border Patrol agent in that case. Are there any other questions? Yes, counsel, I have a couple of questions. First of all, I guess I'm not understanding why you think that we can see everything we need to see from the video. The district court, as I mentioned, the defense counsel, made some conclusions about what was going on when all these unrelated questions were being asked. And that's not... You can't tell that from the video. You can't see the officer when he's asking a series of questions that have nothing to do with the scope of the stop, in the middle of the stop. And we can't tell from that video whether he's continuing somehow to work on the citation. But the district court did make those findings. And I guess I am concerned if we're going to view those facts in a light... If the district court is viewing the facts in a light most favorable to the government, how it might have made those findings in its favor, even though the video and the audio certainly aren't clear on that. Your Honor, I guess what I would point you to is what exactly the defense is now raising as facts that they dispute. And it's not clear from the briefing that, in fact, they are disputing that the computer was not doing its job during the time that the officer was asking the questions of the two defendants. There's nothing in the record to say one way or the other. And I don't know necessarily that the defendant is disputing that, at least even in the first seven minutes, that the computer was not doing its job. Obviously, you can see the officer going back and forth to the car and that kind of a thing. So even if... I guess what I'm saying is, Your Honor, that the defense is not necessarily disputing that the officer was doing that. What he's saying is that he was somehow asking questions that were inappropriate, somehow prolonging this stop. And the facts and what they dispute don't necessarily go to that argument. All right. Well, I have a second question. This is Judge Moritz again. You mentioned Operation Stonegarden, and these officers were working in consultation with the federal government. But as Defense Counsel points out, I think the record's pretty clear that even this officer admitted he does not have any authority to detain or arrest for immigration violations, and nothing about Operation Stonegarden changed that. So how is it that even if we agree with you that there was independent, reasonable suspicion of immigration violations, even if we agree, how do we get to this officer, a state officer, having an independent basis to detain these defendants when he doesn't have the authority in the first instance? He could not have stopped them in the first instance had he suspected immigration violations. How does he have independence to detain them at that point? I'm not understanding your argument on that. On that point, Your Honor, I think what Arizona says is immigration violations as in a person who is illegally here in the country. I don't think that that extends to alien smuggling, which is something necessarily that Sergeant Alvarez potentially could hold somebody for. I agree that he couldn't hold somebody if he just believed that perhaps they were in the country illegally. But beyond that, we have two individuals who were suspected of smuggling aliens, and therefore there is the argument that he did have authority. That all being said, though, What is that argument, counsel, that he had authority? That Arizona is, excuse me, I'm looking for the case site. I apologize. But that the case site where Arizona is one of the, Arizona v. United States, that in that case, they are talking strictly about immigration, administrative immigration cases. They're not talking about cases involving, for instance, alien smuggling. And they go on to say that they would hope and they expect that locals would, in fact, work with the federal government to enforce other types of crimes. Okay. Work with meaning what? That they would do what this officer suggested, which is get in contact with the Border Patrol and then it's up to them to make an arrest. Or that they would actually have the authority to detain someone for alien smuggling. I'm not sure that Arizona v. United States goes that far, Your Honor, except for I would go back. I apologize. I didn't mean to talk over you. But what I do think is that it goes back to the same kind of the example that I was trying to give to Judge Tempevich about if any law enforcement officer suspects someone of a crime, and although they may not have the authority to actually investigate that crime, they certainly and should, from just a basic policy perspective, be able to hold somebody for some period of time in anticipation of the person who can investigate that crime arriving. And that would be the position that the United States would take with regard to the alien smuggling and the reasonable suspicion that the officer had. Judge Morton, again, the authority you cited in your brief on this point doesn't support the position you just took. That McHugh case, I think, is what you cited primarily. And that's not similar to this case. That's a case where you had a security officer that was holding someone at gunpoint who suspected of a crime. He then calls local authority who does have the authority to come out and make an arrest, and they do come out and make an arrest. And the issue in that case was whether the local authority had reasonable suspicion and could rely on this security guard's information. But that case does not stand for the proposition that where an officer doesn't have authority to make an arrest, they somehow have authority to independently detain someone for a period while they contact someone who does have authority. And I didn't see any cases cited in your brief that do say that. Your Honor, I would agree. There are no cases in our brief that do say that. And I'll leave it at that. And are you aware of any? Because you're saying there's a general proposition, but I wasn't able to find any case law in that effect. I'm not, Your Honor. But I would just say from a policy perspective, it wouldn't make sense for a law enforcement officer who suspects a crime to briefly detain someone who they suspect of a crime that they may not have jurisdiction, or excuse me, not jurisdiction, but the authority to investigate, to just detain them briefly, just like I was saying in the bank example where you have someone who they believe is counterfeiting money, for instance. Counsel Judge Tinkovich, some of the questions that were asked were pretty far afield from a traffic stop perspective. How do you justify some of the personal questions that don't seem related to officer safety? And if they were improper under Rodriguez, don't you lose because there's no de minimis exception to the reasonableness of a detention? If I may, Your Honor, I would say that a number of the questions that were asked that you're referencing came after that seven-minute mark. So presuming that there was reasonable suspicion, then it was okay for him to continue in that line of questioning. If, in fact, a few of those questions perhaps were before the seven-minute mark. And, Your Honor, I would say that there's really, that would next go to our causation argument, that there's really no causal connection between any alleged de minimis prolonging of the stop to the discovery of the men in the back. And so without that causation connection, then the fact that the men were discovered, then you must still affirm the district courts. If we don't buy your argument on reasonable suspicion, do you lose because the stop lasted too long? Your Honor, we would still make the argument as we did in our initial, in the initial part of our briefing, that the stop was not unreasonable, even if portions of it were questions that were unrelated to the stop, that the questions were all permissible. When a police officer pulls someone over, you can't, I would expect that there's always small talk, regardless of it being travel plans, and it would be our position that the stop itself was not unreasonable or prolonged at all. Thank you. Judge Seymour or Judge Marucci, do you have any final questions? I'm fine. All right, Mr., if the courtroom deputy could give Mr. Rubin three minutes of rebuttal time. Thank you, Your Honor. We do feel that Arizona versus United States does apply to transporting, and for many of the reasons of why Arizona versus United States came into effect, because this immigration law is a technical area in terms of criminal immigration law, and it's for safety purposes, for understanding what's going on. So the fact is, we make this argument that it's 50 miles from the border. Well, it was, and transporting is one of those areas that we think would be covered under Arizona versus United States for many of the same purposes of why the Supreme Court came to that determination, because you need someone who is actually trained in that aspect of criminal law, asking the right questions and making the right decisions to detain people. So what if this occurred 100 or 200 miles from the border where there was not an opportunity for border control to be accessible to the officers? They have to let them go? So I think, clearly, the context would change. Yes, I mean, again, because it's ultimately just a status offense. I think you... You know, there's border patrol, actually, I don't know within the inside of the country, but I think there's probably border patrol all over the country, and they are trained to do this sort of work. So no matter where we are, I think the argument remains the same, that local law enforcement can call border patrol, and it doesn't take border patrol probably a long time from different places to arrive, but yes, local officers should not be engaged in doing the sort of work that they're not trained to do for safety purposes, for legal purposes, yes. Also, again, I think that it's just so clear from the testimony, the officer admits every single time that he's crossed that each question was not related to the speeding violation, and then his only argument is that, well, it was done simultaneously. That's not believable at all, and also the fact that he's admitting to questions that are completely unrelated really flagrantly flies in the face of the Rodriguez decision. And then the same officer, again, and I mentioned this earlier, states early in the testimony in front of the district court, well, I call border patrol, no, I'm not allowed to arrest them, no, I'm not allowed to detain them, but then he admits in cross, he says, no, I was detaining them because I thought they were engaged in transporting. So he's clearly deviating from what he understands to be the allowed process, which is he's allowed to call border patrol, but that's it, but then he says, no, I was clearly detaining these people, and I think that sort of admission, it just really gives no credibility to the fact that he's simultaneously completing the speeding ticket in a reasonable amount of time. That's all I'd like to say. If there's no further questions, thank you. All right, counsel, we appreciate the arguments. The case will be submitted and counsel excused. I really appreciate your professionalism and the way you handled this type of argument, the world we live in for the next period of time. And I think it worked quite well with your preparation and the way that you handled the argument. So with that, we'll conclude this case and it will be submitted.